| | | | | |
|---|---|---|---|---|
| Minute Order Form (06/97) | **United States District Court, Northern District of Illinois** | | | |
| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | **Sitting Judge if Other than Assigned Judge** | | |
| **CASE NUMBER** | 01 C 2893 | **DATE** | 4/1/2002 | |
| **CASE TITLE** | HOI HUY HUYNH vs. BOARD OF EDUCATION and IRENE M. DAMOTA | | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Chicago Board of Education's motion for summary judgment [42-1] and Irene DaMota's motion for summary judgment [42-2] are granted. DaMota's motion to strike Huynh's affidavit is denied [67-1]. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | APR 0 2 2002 | 72 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | 4/1/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| CB | courtroom deputy's initials | 02 APR -1 PM 3:30 | CB | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOI THI HUYNH | ) |
| | ) |
| Plaintiff, | ) No. 01 C 2893 |
| | ) |
| v. | ) Suzanne B. Conlon, Judge |
| | ) |
| BOARD OF EDUCATION and | ) |
| IRENE M. DAMOTA | ) |
| | ) |
| Defendants. | ) |

DOCKETED
APR 0 2 2002

## MEMORANDUM OPINION AND ORDER

Hoi Thi Huynh ("Huynh") sues the Chicago Board of Education ("the Board") and Irene M. DaMota ("DaMota"), individually and in her official capacity as principal of Roberto Clemente Community Academy ("Clemente"). Specifically, Huynh alleges race, national origin and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, against the Board (Count I), race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") against the Board and DaMota (Count II) and retaliation for exercising her First Amendment rights in violation of 42 U.S.C. § 1983 ("Section 1983") against the Board and DaMota (Count III).

On September 6, 2001, the court dismissed Count III against DaMota. The court also granted the Board's motion to strike allegations in the amended complaint related to conduct occurring more than 300 days prior to the filing of the discrimination charge. The Board and DaMota (collectively, "defendants") now move for summary judgment on the remaining counts pursuant to Federal Rule

1

of Civil Procedure 56. DaMota also moves to strike Huynh's affidavit offered in opposition to defendants' motions for summary judgment.

## BACKGROUND

### I. Evidence

Evidence submitted at the summary judgment stage must be admissible at trial. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Therefore, the court must first determine the admissibility of the evidence presented by the parties before reaching the merits of defendants' motions for summary judgment.

### A. DaMota's Motion to Strike Huynh's Affidavit

In opposition to defendants' motions for summary judgment, Huynh offers a thirty-six page affidavit consisting of sixty-eight separate paragraphs. DaMota moves to strike Huynh's affidavit in its entirety, claiming it contradicts her earlier deposition testimony and "contains a slew of inadmissible hearsay that cannot be considered on summary judgment." DaMota's Response p. 2. DaMota fails to point to any paragraph of Huynh's affidavit contradicting her deposition testimony or containing inadmissible hearsay. "[J]ust as the court is not required to 'scour the record looking for factual disputes,' it is not required to scour the party's various submissions to piece together appropriate arguments." *Little v. Cox's Supermarkets, Inc.*, 71 F.3d 637, 641 (7th Cir. 1995), *quoting Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)(internal citation omitted). Therefore, DaMota's unsupported motion to strike Huynh's affidavit in its entirety is denied.

## B. Timeliness of the Claims

The court's consideration of the evidence is restricted by the applicable statute of limitations. The statute of limitations for Title VII claims is 300 days, calculated from the date the charge of discrimination is filed. 42 U.S.C. § 2000e-5(e). The statute of limitations for Section 1981 and Section 1983 claims is two years, calculated from the date the complaint is filed. *Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1162-63 (7th Cir. 1994)(Section 1981); *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993)(Section 1983). Huynh filed her charge of discrimination on June 15, 2000 and her original complaint on April 23, 2001. Therefore, conduct occurring prior to August 19, 1999 is time-barred for purposes of Title VII and conduct occurring prior to April 23, 1999 is time-barred for purposes of Section 1981 and Section 1983.

In opposition to defendants' motions for summary judgment, Huynh offers evidence of conduct occurring more than 300 days prior to the filing of the charge of discrimination and two years prior to the filing of the complaint. Huynh claims the court authorized the use of this evidence in its September 6, 2001 order striking the same allegations in the amended complaint. In the September 6, 2001 order, the court noted that striking the time-barred allegations from the amended complaint did not necessarily preclude Huynh from offering past conduct evidence at trial. Indeed, Federal Rule of Evidence 404(b) specifically provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . .

Fed.R.Evid. 404(b). The court may consider time-barred evidence for purposes of establishing discriminatory intent. *See Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 614 n. 4 (7th Cir. 2001). The court may not consider any conduct occurring prior to August 19, 1999 for the Title VII

3

claims or April 23, 1999 for the Section 1981 or Section 1983 claims as a basis for recovery. *See Id.*

## II. Facts

The following facts are undisputed unless otherwise noted. The Board hired Huynh, an Asian female of Vietnamese national origin, as a teacher in September 1986. Shortly thereafter, Huynh transferred to Clemente. In 1989, Huynh became a regularly appointed, tenured teacher. Throughout her employment, Huynh has been a member of the Chicago Teachers Union ("the Union") subject to the terms and conditions of the collective bargaining agreement ("CBA") between the Union and the Board.

During each school year between 1989 and 1997, Huynh taught five classes consisting of two or three Vietnamese bilingual mathematics or science classes and two or three regular mathematics classes. In February 1997, Paul Vallas ("Vallas"), former chief executive officer of the Chicago Public School, appointed DaMota as the interim principal of Clemente.

For the 1997-1998 school year, DaMota evaluated Huynh's performance as satisfactory. For the 1998-1999 school year, DaMota raised Huynh's performance evaluation to excellent. During the 1998-1999 evaluation meeting, Huynh informed DaMota of her intent to take a leave of absence during the 1999-2000 school year to visit her ailing mother in Vietnam. According to Huynh, she suggested taking the leave of absence during the spring semester after teaching the fall semester classes of John Henle, a non-Asian, non-Vietnamese male teacher who was scheduled to go on sabbatical. According to DaMota, she did not expect Huynh to return at all for the 1999-2000 school year.

When Huynh reported to Clemente for the 1999-2000 school year, DaMota had not assigned her to a program. DaMota subsequently assigned Huynh to four skills classes, or reading workshops, and one Vietnamese language class. Henle's mathematics classes were assigned to Simon Kent, a non-Asian, non-Vietnamese male teacher.

On August 30, 1999, DaMota switched Huynh's homeroom assignment with that of Ms. Mucino, a non-Asian, non-Vietnamese female teacher. According to Huynh, Mucino's homeroom class was comprised of double demoted freshman with emotional behavioral problems while her homeroom class was comprised of juniors.

On September 15, 1999, DaMota arrived in Huynh's classroom unannounced to observe her performance. DaMota provided Huynh with a classroom feedback form at the end of the period without discussing it with her.

On September 20, 1999, DaMota reminded Huynh and six other non-Asian, non-Vietnamese teachers that all keys were to remain in the building. Huynh denies taking her keys from the building unless the office, where the keys were to be kept, was locked.

On September 21, 1999, Huynh requested a meeting with DaMota to discuss her concerns about her students. On October 8, 1999, DaMota asked Huynh to come to her office. Huynh went to DaMota's office where she waited for 15 minutes while DaMota was engaged in a conversation with other people. DaMota then asked Huynh to return in 10 minutes, which Huynh did, only to be kept waiting for another 7 minutes. When Huynh finally entered DaMota's office, DaMota continued to work at her computer. When Huynh asked her what she was doing, DaMota told Huynh that she was writing a letter about the meeting that was about to take place. DaMota then asked

Huynh to return during seventh period. Huynh declined, telling DaMota that she had a class during seventh period.

On November 19, 1999, Huynh received a copy of the memorandum written by DaMota on October 8, 1999. In the memorandum, DaMota provided Huynh with suggestions to improve her performance. DaMota also asked Huynh for a report "of [her] own interventions to reduce the level of learning interference these dysfunctionalities present." Huynh Statement of Additional Facts ("Huynh Facts") ¶ 65.

At the end of the day on December 2, 1999, Huynh received two memoranda from DaMota. In the first memorandum, DaMota requested a meeting with Huynh to review her interventions report as well as her classroom productivity report. In the second memorandum, DaMota requested a meeting with Huynh to discuss why she had not turned in her lesson plans.

On December 3, 1999, Huynh met with DaMota. Huynh informed DaMota that she previously turned in her lesson plans. Huynh also informed DaMota that they needed to discuss DaMota's classroom observation, including the November 19, 1999 memorandum. When the bell rang, Huynh ended the meeting by returning to class.

On December 6, 1999, DaMota requested another meeting with Huynh. During the meeting, DaMota requested that Huynh prepare a written plan for improving her classroom performance based upon DaMota's suggestions in the November 19, 1999 memorandum. Huynh informed DaMota that her observations of Huynh's performance were inaccurate. At the conclusion of the meeting, DaMota told Huynh that they would reconvene on December 8, 1999 so she could submit her written plan. DaMota cancelled the meeting for personal reasons. DaMota requested that Huynh reschedule the meeting for the following week. The meeting was never rescheduled.

On December 15, 1999, Huynh informed DaMota that it was "time for the union to get involved in this clearly racist and discriminatory approach of yours." Huynh Facts ¶ 78. On December 21, 1999, Huynh met with a Union representative to discuss DaMota's conduct. On December 29, 1999, the Union initiated a grievance on Huynh's behalf.

Pursuant to the CBA, an initial meeting was held to discuss Huynh's grievance on January 21, 2000. Without consulting Huynh, DaMota reassigned Huynh to teach the advanced algebra/trigonometry program taught by Dell Alexander, a non-Asian, non-Vietnamese male. DaMota reassigned Alexander to teach Henle's algebra program and Henle to teach Huynh's skills classes. Huynh was not satisfied with the reassignment.

On February 8, 2000, assistant principal Carmen Rodriguez asked Huynh to meet with Miriam Devora. Devora was upset that her niece, Diana, had earned a "D" in Huynh's skills class during the fall semester. According to Huynh, Rodriguez made no attempt to control Devora, who "threatened Huynh and verbally attacked her throughout the meeting." Huynh Facts ¶ 99. Specifically, Devora pointed her index finger in Huynh's face and said, "Next time when I see you with the principal, you better prepare to defend yourself and change the "D" to an "A". Huynh Facts ¶ 100.

On February 10, 2000, DaMota arrived in Huynh's classroom unannounced to observe her performance. When the class was over, DaMota approached Huynh to discuss her observation. DaMota told Huynh, "Why don't you look for another school? Otherwise I will document all of the negatives and you may lose your certification. And I don't want to do that." Huynh Facts, ¶ 105. DaMota also remarked to Huynh that her culture may make her a very good teacher in another place, but not at Clemente. *Id.*

On February 15, 2000, DaMota requested a meeting with Huynh to discuss the issues raised during her February 10, 2000 observation. Huynh refused to attend the meeting without union representation.

On February 16, 2000, DaMota and Rodriguez were meeting with Devora when Huynh happened to come by the office. DaMota and Rodriguez asked Huynh to join them. Huynh eventually attended the meeting with her union representative.

On February 23, 2000, Huynh received a memorandum from DaMota requesting another meeting with Devora. Thereafter, DaMota informed Huynh that Huynh's documentation regarding Diana was insufficient. During the meeting held on February 28, 2000, Huynh was forced to defend the grade given to Diana.

On February 29, 2000, Huynh prepared a letter to the parents and guardians of the students in her advanced algebra/trigonometry classes informing them that their children were "totally lost." Huynh Facts ¶¶ 123-124. Huynh provided a copy of the letter to DaMota and Vallas. Huynh thereafter sent the letter on March 3, 2000.

On March 2, 2000, Huynh wrote a letter to Vallas, complaining of "threats, harassments, verbal assaults, false accusations and insults from the current principal of Clemente High School, Ms. Irene DaMota, as well as from [her] students and some of their parents and guardians." Huynh Facts ¶¶ 130-131. Vallas responded by denying Huynh's grievance.

On March 14, 2000, Huynh turned in five-week letter grades for the students taking her advanced algebra/trigonometry classes. Huynh gave approximately 20% of her students "D" grades and approximately 80% of her students "F" grades.

On March 31, 2000, DaMota requested a meeting with Huynh. When Huynh arrived at the meeting, mathematics department chair Kevin Cox was already there. Huynh refused to attend the meeting without union representation. Thereafter, DaMota switched Huynh and Alexander's mathematics programs.

During the 1999-2000 school year, Huynh applied to teach after-school mathematics classes at Clemente. Yositara Almeida, a non-Asian, non-Vietnamese female chemistry teacher was selected for the position. At the time Almeida was selected, Rodriguez was responsible for staffing the after-school mathematics classes.

From April 2000 through August 2000, Huynh took a leave of absence. Huynh spent two weeks in May 2000 visiting her mother in Vietnam. When Huynh returned to Clemente for the start of the 2000-2001 school year, she was assigned to teach a geometry program. Approximately three weeks into the school year, assistant principal Rodriguez called Huynh into a meeting with a student and the student's father. The father requested a different teacher because his daughter could not understand Huynh. After Huynh spoke with the father, the father agreed to keep his daughter in Huynh's class. In mid-October, Huynh contacted the student's father about the ongoing problem she was having with his daughter. Huynh agreed to meet with the father the following day to discuss a solution to the problem, including the possibility of changing teachers. The next day, DaMota called Huynh into a meeting with the student's father. DaMota accused Huynh of making an offensive telephone call to the student's father. DaMota also informed Huynh that she did not have the right to change teachers. Huynh then left the meeting. The following day, Huynh took another leave of absence. Huynh has not returned to work.

# DISCUSSION

## I. Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The summary judgment standard is applied with special scrutiny to employment discrimination cases because the outcome may depend on determinations of credibility and intent. *Michas v. Health Cost Controls of Illinois*, 209 F.3d 687, 692 (7th Cir. 2000).

## II. Title VII and Section 1981 Discrimination Claims

Title VII prohibits an employer from discharging or otherwise discriminating against an employee in the terms, conditions or privileges of employment based on the employee's race, national origin or sex. 42 U.S.C. § 2000e-2(a). Title VII's prohibition against discrimination also protects employees against harassment. 42 U.S.C. § 2000e-2(a)(1). Section 1981 similarly prohibits employment discrimination and harassment based on race. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 346 (7th Cir. 1999), *citing Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1034 (7th Cir. 1998). "While Section 1981 and Title VII differ in the types of discrimination they

proscribe, the methods of proof and elements of the case are essentially identical." *Von Zukerstein v. Argonne National Laboratory*, 984 F.2d 1467, 1472 (7th Cir. 1993).

In order to prove a case of discrimination under Title VII or Section 1981, Huynh must offer either direct or indirect evidence of discrimination. *Id.* Under either approach, Huynh must show she suffered a materially adverse employment action. *Haugerud v. Amery School District*, 259 F.3d 678, 691 (7th Cir. 2001).

A.  **Adverse Employment Action**

An adverse employment action is one that materially affects the terms and conditions of employment. *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* For example, "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage of salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* "Not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a discrimination suit." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996).

Huynh claims DaMota subjected her to several adverse employment actions within the limitations period by: (1) assigning her to a program of skills classes rather than mathematics classes; (2) switching her homeroom assignment to a class of students with emotional behavioral problems; (3) subjecting her to unwarranted reprimands and criticisms of her job performance; (4) reassigning her to a program of advanced algebra/trigonometry classes comprised of students who

11

lacked knowledge of pre-algebra and basic algebra; (5) instigating disputes with her students' parents; and (6) reassigning her to a program of algebra classes. During this time period, Huynh did not suffer any loss in pay, benefits or seniority.

The Seventh Circuit has "repeatedly held that a lateral transfer without a loss in benefits does not constitute an adverse employment action." *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 702 (7th Cir. 2001). "The fact that [the plaintiff] did not like the new position is irrelevant when there is no evidence that the transfer decreased her responsibilities or benefits in any way." *Id.*, *citing Place v. Abbott Laboratories, Inc.*, 215 F.3d 803, 810 (7th Cir. 2000)("[B]eing shifted to an essentially equivalent job that [the plaintiff] did not happen to like as much does not a Title VII claim create"). Huynh has not offered any evidence that DaMota's assignments were accompanied by a "dramatic downward shift in skill level required to perform [her] job responsibilities." *See Hoffman-Dombrowski v. Arlington International Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001).

Huynh likewise failed to show any consequence of the unwarranted reprimands and criticisms of her performance or disputes with her students' parents. Unfavorable performance evaluations, including oral or written reprimands, do not constitute an independent basis for liability absent a tangible job consequence. *Oest*, 240 F.3d at 613. Indeed, Huynh has not demonstrated any material harm resulting from the challenged actions.

Nevertheless, Huynh claims DaMota's conduct created a hostile work environment severe enough to constitute an adverse employment action. Harassment can rise to the level of an adverse employment action if it is severe enough to cause a significant change in the plaintiff's employment status. *Stutler*, 263 F.3d at 703. Whether harassment is sufficiently severe or pervasive depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The work environment cannot be described as hostile unless a reasonable person would find it offensive and Huynh actually perceived it as hostile. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1993).

The record supports an inference that Huynh perceived her work environment as hostile. Huynh complained about the work environment to DaMota before filing a Union grievance. Thereafter, Huynh complained to Vallas, who ultimately denied her grievance. Huynh then took a leave of absence from April through August 2000 and then again from October 2000 to the present. Huynh's actions demonstrate her unwillingness to tolerate what she perceived to be a hostile environment.

Whether Huynh's work environment objectively could be construed as hostile "should be judged from the perspective of a reasonable person in [Huynh's] position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). A workplace must be "hellish" before it is actionable as a hostile environment. *See Logan v. Kautex Textron North America*, 259 F.3d 635, 641 (7th Cir. 2001).

Huynh's work environment was far from "hellish" during the limitations period. Over the approximately ten months that Huynh worked during the 1999-2000 and 2000-2001 school years, DaMota subjected Huynh to three unwarranted reprimands, two unannounced observations that resulted in criticism of her performance, and two parental disputes that required Huynh's attendance at a handful of meetings. DaMota also required Huynh to teach skills classes for one semester. Even when DaMota assigned Huynh to teach the mathematics classes she preferred, Huynh remained

dissatisfied with her assignments. Considering all the circumstances in the light most favorable to Huynh, a reasonable jury could not find the conduct endured by Huynh was so severe or pervasive as to constitute an adverse employment action.

Finally, Huynh claims Rodriguez denied her the opportunity to teach an after-school mathematics class. According to Huynh, the lost opportunity resulted in a loss of overtime pay. Construing the evidence in a light most favorable to Huynh, a reasonable jury could find Huynh's loss of the position, and thus additional pay, constituted an adverse employment action. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)("tangible employment action in most cases inflicts direct economic harm").

## B.     Similarly Situated Employees

Huynh does not present direct evidence that Rodriguez failed to give her the after-school position based on her race, national origin or sex. *See Fuka v. Thomson Comsumer Electronics*, 82 F.3d 1397, 1403 (7th Cir. 1996)(alleged discriminatory remarks must be related to the employment decision in question). Instead, she relies on the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish her claims of race, national origin and sex discrimination. Specifically, Huynh must show that Rodriguez gave the after-school position to someone outside her protected class who was as qualified or less qualified than her. *See Von Zukerstein*, 984 F.2d at 1472, *citing McDonnell Douglas*, 411 U.S. at 802.

Huynh claims Rodriguez gave the position to Almeida, a non-Asian, non-Vietnamese female teacher. Almeida, who is female, is not outside Huynh's protected class for purposes of her sex discrimination claim. In any event, Huynh failed to provide any evidence as to Almeida's education,

14

experience or qualifications. Without evidence that Huynh was as qualified as Almeida for the after-school position, Huynh cannot establish a *prima facie* case of discrimination.

### III. Title VII Retaliation Claim

Title VII prohibits employers from retaliating against employees who oppose unlawful employment practices covered by Title VII. 42 U.S.C. § 2000e-3(a). In order to prevail on a claim of retaliation under Title VII, Huynh must offer either direct or indirect evidence of retaliation. *See Smart*, 89 F.3d at 439. Huynh does not offer direct evidence in support of her retaliation claim. Instead, she relies on the burden-shifting method set forth in *McDonnell Douglas*.

To establish a *prima facie* case of retaliation, Huynh must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected expression and the adverse action. *Worth v. Tyler*, 276 F.3d 249, 265 (7th Cir. 2001). Although defendants do not dispute Huynh engaged in protected activity, defendants claim that Huynh cannot establish the second and third elements of a *prima facie* case.

As discussed above, the only adverse employment action suffered by Huynh was denial of the after-school position. However, Huynh does not offer any evidence whether Rodriguez's decision occurred before or after she complained about DaMota's conduct. Even if Rodriguez made the decision after the complaint, Huynh has not offered evidence establishing that Rodriguez knew of the complaint. Absent knowledge of the complaint, Huynh cannot establish Rodriguez retaliated against her for complaining about DaMota's conduct. *See Maarouf v. Walker Manufacturing Co.*, 210 F.3d 750, 755 (7th Cir. 2000).

## IV. Section 1983 Retaliation Claim

In order to state a Section 1983 retaliation claim, Huynh must show: (1) her conduct was constitutionally protected; and (2) her actions were a substantial or motivating factor in the alleged retaliation. *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). The court previously granted DaMota's motion to dismiss Huynh's Section 1983 retaliation claim. Specifically, the court determined that Huynh's February 29, 2000 and March 2, 2000 letters did not address a matter of public concern. In support of her claim against the Board, Huynh relies on her February 29, 2000 and March 2, 2000 letters. For the reasons stated in the court's September 6, 2000 order, Huynh's speech does not address a matter of public concern.

## CONCLUSION

The Board and DaMota are entitled to judgment as a matter of law on all claims advanced by Huynh.

Date: April 1, 2002

ENTER:

Suzanne B. Conlon
United States District Judge